UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------X

ALBERT REICHMANN,

                    Plaintiff,

          -against-                    04 Civ. 09485 (MGC)

JOSEPH NEUMANN,

                    Defendant.

--------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/22/08

OPINION

APPEARANCES:

          TRACHTENBERG RODES & FRIEDBERG LLP
          Attorneys for Plaintiff
          545 Fifth Avenue
          New York, New York 10017

          By:  David G. Trachtenberg, Esq.
               Anne W. Salisbury, Esq.

          STROOCK & STROOCK & LAVAN LLP
          Attorneys for Defendant
          180 Maiden Lane
          New York, New York 10038

          By:  Curtis C. Mechling, Esq.
               Francis C. Healy, Esq.
               Robin E. Keller, Esq.

**Cedarbaum, J.**

     Defendant Joseph Neumann moves for sanctions against

plaintiff Albert Reichmann, plaintiff's counsel David G.

Trachtenberg, and the firm of Trachtenberg Rodes & Friedberg,

LLP, pursuant to Fed. R. Civ. P. 11(b), 28 U.S.C. § 1927, and

the district court's inherent power to sanction.  For the

reasons that follow, Neumann's motion is granted and sanctions

are assessed against Albert Reichmann and his attorneys, David

Trachtenberg and the law firm of Trachtenberg Rodes & Friedberg.

## BACKGROUND

### I. Overview

On December 2, 2004, Albert Reichmann filed this action

against Joseph Neumann for breach of contract. The complaint

alleged that Neumann had failed to repay a debt of $21 million,

owed to Albert and his brothers Paul and Ralph Reichmann.

Albert Reichmann sought the $7 million portion which he alleged

was owed to him.[1]  Neumann, through counsel, wrote a letter to

Albert Reichmann a month after the complaint was served. In his

letter, Neumann put Albert Reichmann and his attorneys on notice

that the allegations were inaccurate, that any debt owed to the

Reichmann family was owed to Paul Reichmann, and that the debt

had been settled in 1992. Neumann enclosed a copy of the

settlement agreement signed by Paul Reichmann.

Notwithstanding Neumann's letter and the settlement

agreement enclosed, Albert Reichmann and his counsel pursued

---

[1]     The First Amended Complaint alleged that Neumann owed
        Albert Reichmann "at least $8 million." (¶ 25.) The
        Second Amended Complaint alleged that Neumann owed Albert
        Reichmann $8,045,210. (¶ 32.) Albert Reichmann's Proposed
        Findings of Fact in the Joint Pretrial Order alleged that
        Neumann owed Albert Reichmann $27,218,419.31 pursuant to a
        1996 oral contract. (Joint Pretrial Order at 15.)

2

this litigation for more than two years thereafter, shifting their allegations to accommodate whatever inconvenient facts and documents appeared.

On February 2, 2007, shortly before trial, Albert Reichmann's counsel sought to withdraw the action. The reason for the withdrawal was that a third party had produced documents proving that Albert Reichmann had no claim against Neumann. Some of these documents were signed by Albert Reichmann. Albert Reichmann knew all along that his claim against Neumann had no basis in fact. From the first day it was filed, this action was harassing, extortionate, and completely without merit. It is the essence of a bad faith lawsuit and an abuse of court process.

The facts of the case are set out below.

## II. The loan to Neumann

The following facts are taken from the parties' December 22, 2006 Joint Pretrial Order and are not disputed.

From the 1960s to the early 1990s, Albert, Paul, and Ralph Reichmann owned and controlled the Canadian-based company Olympia & York Developments, Ltd. Through Olympia & York Developments, the Reichmanns operated a successful real estate business. The Reichmanns also owned and controlled a partnership by the name of O&Y 25 Realty Company, which in turn

was the general partner and 99.9% owner of O&Y 25 Realty Company LP.

In the mid-1980s, Joseph Neumann, through Broadway Management Co., Inc., owned and operated approximately 12 million square feet of office space in New York City. His personal ownership interest in the real estate was worth approximately $1.25 billion. When the real estate market crashed in the late 1980s, Neumann was forced to reorganize his holdings.

In the spring of 1989, Neumann asked Paul Reichmann for a $25 million personal loan to support his real estate operations. Paul Reichmann did not make a direct loan to Neumann, but arranged for First National Bank of Chicago to lend Neumann $25 million and guaranteed that loan.

Later that year, one of the Olympia & York affiliates, Olympia & York Real Estate (USA) Inc. ("OYREUSA"), acknowledged that Paul Reichmann's guarantee of the loan "was given ... at the request of, and on behalf of, OYREUSA, in order to obtain, for the benefit of OYREUSA, certain rights in respect of Neumann's real estate portfolio," and as a result "OYREUSA hereby indemnifies [Paul] Reichmann in respect of any amounts he may be called upon to pay under the guarantee." (June 13, 1989 Memorandum of Agreement.) The agreement was signed by Albert

Reichmann as chairman of the board of OYREUSA and by Paul Reichmann.

The next day, O&Y 25 Realty Company LP acknowledged "that OYREUSA was acting on ... behalf [of O&Y 25 Realty Company LP] in giving the indemnity to [Paul] Reichmann," and that O&Y 25 Realty Company LP "hereby indemnifies OYREUSA in respect of any amounts it may be called upon to pay [Paul] Reichmann." (June 14, 1989 Memorandum of Agreement.) This second agreement was signed by Tom Murphy, a vice president of O&Y 25 Realty Company LP, and Albert Reichmann, as chairman of the board of OYREUSA.

In May of 1990, Neumann defaulted on his debt to First National Bank of Chicago. Pursuant to the June 13, 1989 agreement, a subsidiary of OYREUSA paid Neumann's debt, which was $28,235,631. Pursuant to the June 14, 1989 agreement, O&Y 25 Realty Company LP reimbursed OYREUSA in full for its payment of Neumann's debt. The board of directors of OYREUSA authorized the transfer of Neumann's $25 million promissory note to O&Y 25 Realty Company LP.

Subsequent events were obscured by Albert Reichmann throughout the course of the litigation. However, after the deposition of Paul Reichmann in September of 2006 and the production of documents by one of Paul Reichmann's attorneys, it was incontrovertibly demonstrated that Albert Reichmann did not

have a valid claim against Neumann. Those revelations are best discussed in the context of the litigation.

## III.  Albert Reichmann's suit against Neumann

### A.  The original complaint

This action for breach of contract and unjust enrichment was commenced in December of 2004 by Albert Reichmann against Joseph Neumann.[2]  According to the complaint, a loan of $25 million was made to Neumann by or on behalf of Albert, Paul, and Ralph Reichmann.  (Complaint ¶ 5.)  Neumann was alleged to have repaid $4 million between 1992 and 2000.  (Id. ¶ 10.)  The unpaid amount was therefore $21 million, $7 million of which was owed to Albert Reichmann.  (Id. ¶¶ 7-8.)

Neumann, through counsel, promptly wrote to Albert Reichmann's counsel that the suit was "without merit, and should be withdrawn."  (January 10, 2005 Letter of Robin E. Keller to David G. Trachtenberg.)  Neumann attached three documents:  (1) a settlement agreement releasing Neumann from his debt; (2) a letter from one of Paul Reichmann's attorneys, enclosing the signature page of the settlement agreement, signed by Paul Reichmann; and (3) a letter from one of Neumann's attorneys,

---

[2]     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).  Albert Reichmann is a citizen of Canada and Joseph Neumann is a citizen of New York.

stating that it enclosed Neumann's payment to Paul Reichmann in settlement of the debt.

The settlement agreement that Neumann enclosed was dated August 19, 1991. The agreement was a comprehensive settlement with a number of Neumann's creditors, including Paul Reichmann. In the agreement, Neumann acknowledged that he had an outstanding debt of $30,625,000 to Paul Reichmann, and offered partial payment of $207,830 in order to settle and release the debt. (August 19, 1991 Settlement Agreement by and among Joseph Neumann and Each Party Whose Name Is Listed on Exhibit A Attached to This Agreement and who Executes This Agreement ("the 1991 Settlement Agreement").)

Neumann also enclosed a March 24, 1992 letter from Julius Berman, executive vice president of the Olympia & York Companies (USA), to Broadway Management Co., the entity through which Neumann operated his real estate holdings. Mr. Berman wrote that Paul Reichmann had executed his copy of the 1991 Settlement Agreement. The signature page of the agreement was enclosed, signed by Paul Reichmann.

Neumann also enclosed an April 2, 1992 letter from Barbara Kaplan of Stroock & Stroock & Lavan to Mr. Berman. Ms. Kaplan wrote, "We have received Paul Reichmann's signature page for the Joseph Neumann Global Settlement Agreement. Accordingly, I enclose herewith a check to the order of Mr. Reichmann in the

amount of $217,211.69 (which includes interest on the Reichmann
pro rata share of the Escrow Account from March 23, 1991)...."

## B.  The May 27, 2005 motion for sanctions

Despite receiving the 1991 Settlement Agreement and the
signature of Paul Reichmann, Albert Reichmann did not withdraw
this suit.  In March of 2005, Neumann served his Answer, raising
the affirmative defense that his debt had been settled by
agreement with Paul Reichmann.  In April, Neumann sought
discovery of all documents concerning the loan and assignment of
the debt.  When no such documents were forthcoming, Neumann
again sent a letter to Albert Reichmann, through counsel,
requesting withdrawal of the Complaint.  The letter stated that:

> "Federal Rule of Civil Procedure 11(b) provides that,
> by signing the Complaint, you have certified that to
> the best of your knowledge, information and belief,
> formed after an inquiry reasonable under the
> circumstances, the allegations and other factual
> contentions have evidentiary support or, if
> specifically so identified, are likely to have
> evidentiary support after a reasonable opportunity for
> further investigation or discovery.
>
> As previously explained to you on several occasions,
> our review of the facts in this case indicates that
> there is absolutely no basis for this claim for the
> following reasons:
>
> 1. The $25 million loan ... was not made by Plaintiff
> or his brother, as the Complaint falsely alleges, but
> by the First National Bank of Chicago.

2. The Loan was guaranteed by Plaintiff's brother, Paul Reichmann, and Israel Green, with no involvement whatsoever from Plaintiff.

3. Paul Reichmann released Neumann from all remaining indebtedness from the Loan in 1992 pursuant to the comprehensive Settlement Agreement previously provided to you.

4. As previously explained, the payments Neumann made totaling $4.4 million to various members of the Reichmann family between 1992 and 2002 were completely unrelated to the original loan which was discharged in 1992....

These facts could have easily been disclosed with a minimal amount of investigation. Therefore, it is apparent you failed to conduct 'an inquiry reasonable under the circumstances' as required under Rule 11, and as further evidenced by your inability to produce any supporting documents to this point."

(May 27, 2005 Letter of Brian M. Cogan to David G.

Trachtenberg.) Neumann also served Rule 11 motion papers on Albert Reichmann. The letter stated that Neumann would seek sanctions if the Complaint was not withdrawn in 21 days.

Neumann wrote to this court on June 15, 2005, giving notice of his intention to file a motion for Rule 11 sanctions. However, Albert Reichmann produced documents soon thereafter, and the Rule 11 motion was not filed with the court.

The documents produced by Albert Reichmann included the June 13, 1989 agreement and the June 14, 1989 agreement discussed above. These two memoranda, both signed by Albert Reichmann, proved that First National Bank of Chicago, not the Reichmann brothers, had made the loan to Neumann; that Paul

Reichmann, not Albert Reichmann, had guaranteed the loan; and that the loan had been assigned to O&Y 25 Realty Company LP, not to Albert Reichmann. Given these documents, it appeared that Albert Reichmann had no contract with Neumann and therefore no claim against Neumann for breach of contract.

## C. The First Amended Complaint

Albert Reichmann filed a First Amended Complaint, with some new allegations. In this new version of events, Paul Reichmann initially guaranteed the loan, then transferred it "to a privately held Reichmann Family limited partnership, O&Y 25 Realty Company LP, which took over both the rights and the obligations associated with the guaranty, with the full knowledge and consent of Neumann." (First Amended Complaint ¶ 7.) Neumann defaulted on the outstanding amount owed, $28,235,631, and O&Y 25 Realty Company LP paid the debt. According to the new allegations, Neumann's debt "was always intended to be divisible and was always intended to be paid back to the Reichmann Family in three equal parts corresponding to the three equal amounts ultimately paid by Albert Reichmann, Paul Reichmann and Ralph Reichmann by reason of the guaranty of the Loan by the privately held Reichmann Family limited partnership." (First Amended Complaint ¶ 14.)

10

The new complaint did not address the 1991 Settlement
Agreement between Neumann and Paul Reichmann. Instead, it
alleged that "[i]n December 1992 Neumann began making repayments
to the Reichmann Family (or to individuals associated with the
Reichmann Family, by direction of a Reichmann Family member) to
begin to satisfy his debt relating to the Loan." (Id. ¶ 15.)
Neumann paid $4 million to the Reichmann family between 1992 and
2000. Therefore Neumann owed, according to Albert Reichmann,
some $24 million to the Reichmann Family, and "approximately $8
million" to Albert Reichmann. (Id. ¶ 18.)

Neumann moved to dismiss on the ground that Albert
Reichmann lacked standing to bring the action, because an
individual partner may not sue on behalf of a partnership absent
an assignment. Oral argument was heard on March 16, 2006, and
Albert Reichmann's counsel was asked to identify the contract
that Neumann had breached:

> "MR. TRACHTENBERG: .... I will say that the complaint
> expressly alleges that our client, Albert Reichmann,
> was the successor in interest --
>
> THE COURT: .... That is a legal conclusion. I need to
> know what makes him the successor.
>
> MR. TRACHTENBERG: The answer is he is a successor in
> interest by the assignment.
>
> THE COURT: Where does the complaint allege
> assignment?

> MR. TRACHTENBERG: The complaint does not use the word
> assignment, does not allege the existence of the
> assignment."

(Transcript of March 16, 2006 hearing on motion to dismiss the
First Amended Complaint at 4.) Counsel further explained
that Albert Reichmann was the successor in interest to O&Y 25
Realty Company LP, which was the successor by subrogation to the
rights of the bank. Acknowledging that an individual partner
such as Albert Reichmann could not sue on behalf of the
partnership absent an assignment of the claim to one of the
partners,[3] counsel stated that there had in fact been such an
assignment. However, "[t]he assignment is not in writing. It's
verbal. Remember, [O&Y 25 Realty Company LP] was a family-owned
limited partnership. It was the vehicle used by the Reichmann
brothers ... for their personal matters." (Id. at 6.)

Albert Reichmann was given leave to amend the complaint to
allege the assignment.

---

[3]    "Under New York law, 'a partnership cause of action belongs
only to the partnership itself or the partners jointly, and
... an individual member of the partnership may only sue
and recover on a partnership obligation on the
partnership's behalf.'" Handelsman v. Bedford Village
Assocs. Ltd. P'ship, 213 F.3d 48, 54 (2d Cir. 2000)(quoting
Gmerek v. Scrivner, Inc., 634 N.Y.S.2d 299, 299 (4th Dep't
1995)).

## D.  The Second Amended Complaint

Albert Reichmann's Second Amended Complaint made the new
allegation that "[d]uring or about the summer of 1996, [O&Y 25
Realty Company LP] assigned its claim against Neumann in equal
parts to Albert Reichmann, Paul Reichmann and Ralph Reichmann."
(Second Amended Complaint ¶ 22.)  The assignment was allegedly:

> "effected by Albert Reichmann, acting for [O&Y 25
> Realty Company LP].... Albert Reichmann, Paul
> Reichmann and Ralph Reichmann each had the right,
> power and authority to act without consulting the
> others in matters of this kind.... Albert Reichmann
> exercised this right, power and authority to cause the
> entire claim against Neumann to be assigned in equal
> parts to Albert Reichmann, Paul Reichmann and Ralph
> Reichmann."

(Id. at ¶ 23.)

At his deposition, Albert Reichmann was asked about the

assignment:

> "Q. Was there conversation between you and Paul
> regarding this assignment?
> A. Yes.
> Q. What was discussed?
> A. It was discussed, I said it before, I think that he
> was not collecting any money on the debt. So he said,
> Let's collect -- if you can collect it, let's collect
> it.
> ....
> Q. Was that the only discussion you had regarding this
> assignment?
> A. As far as I remember, yeah.
> ....
> Q. When did that discussion take place?
> A. In about 1996."

(May 16, 2006 deposition of Albert Reichmann at 82-83.)

Albert Reichmann's position that he had been assigned the partnership's claim against Neumann rested on two planks: (1) that Paul Reichmann's signature on the 1991 Settlement Agreement was not authentic; and (2) that O&Y 25 Realty Company LP had the right, in 1996, to assign its claim to Albert Reichmann.

## E. The "forged" settlement between Neumann and Paul Reichmann

Throughout the litigation, Albert Reichmann maintained that Paul Reichmann's signature on the 1991 Settlement Agreement was not authentic. See, e.g., July 6, 2006 Declaration of Albert Reichmann ¶ 6 ("I do not recognize the signatures contained on page 20 of the Settlement Agreement and on the June 13, 1989 Memorandum and believe that they are not those of my brother Paul Reichmann."). Rather than contact his brother or his brother's attorneys[4] to verify the authenticity of the signature, Albert Reichmann hired a handwriting expert. This expert determined that the signature was a forgery.

---

[4] Albert and Paul Reichmann had a falling out. (Transcript of March 16, 2006 Hearing at 23.) The brothers were opposing parties in a proceeding in a rabbinical court in Canada, regarding various loans they made and who should be responsible for them. According to Paul Reichmann, "Decisions were reached and Albert was ordered to make certain payments which he neglected to pay, therefore those have never been honoured." (September 28, 2006 Deposition of Paul Reichmann at 18.) A breach in the family relationship is no excuse for Albert Reichmann's failure to make a reasonable inquiry as to the evidentiary support for his claims.

14

Paul Reichmann refused to be deposed. His lawyer suggested that, as an alternative, Neumann should draft an affidavit for Paul Reichmann to sign. A statement was drawn up, but Paul Reichmann refused to sign it. He did, however, send the following response:

> "I will not sign a letter prepared by Mr. Neuman[n]'s attorney[.] Mr Neuman[n] is a gentleman with the utmost integrity and high moral standards, but he is in court with one of my brothers (and although it is totally absurd), I must stay away from it. Nevertheless, the simple facts, I must state:
>
> I definitely did sign an agreement, as reported by Julius Berman in March 1992.... I know that it is 'my signature.' This certainty is reinforced by the fact that at some point in time Mr Neuman[n] came to me saying that he [is] doing better and feels a moral obligation to do something for us. I told him that he has no obligation to make any payments, that personally I would not accept any and will so recommend to my brothers who were executives of Olympia & York. At the same time, I told him that my brothers, Edward & Louis, were not directly involved in Olympia & York but did suffer with the losses and I would have no objection to him making payments to them. He started to do so, principally as directed by Louis and at a later time Albert asked me if he can deal with Mr Neuman[n] directly and I did not object.
>
> I was subsequently told by friends that Albert and Mr Neuman[n] settled for a total payment of $4 million. Part of this was paid earlier to Louis' family and the balance subsequently to Egosah Reichmann. To the best of my recollection all this is set out in great detail in the rabbinical court records."

(July 11, 2006 email from Peter Ruby to Paul Bates and Francis C. Healy, enclosing statement by Paul Reichmann.)[5]

In September of 2006, a document was produced that severely undercut Albert Reichmann's position regarding the forgery of Paul Reichmann's signature. It was a cancelled check, written from an IOLA account by Neumann's attorneys, for $217,211.69. The amount of the check matched perfectly the documents that Neumann had sent to Albert Reichmann on January 10, 2005, when Neumann asked for the suit to be withdrawn. Specifically, $217,211.69 was the amount paid to Paul Reichmann in settlement of Neumann's debt, according to the April 2, 1992 letter from Neumann's attorney Barbara Kaplan to Paul Reichmann's attorney Julius Berman. Paul Reichmann endorsed the $217,211.69 check as

---

[5]    Albert Reichmann responded by writing directly to Paul Reichmann on September 7, 2006. Albert Reichmann's letter pointed out that Paul Reichmann personally received $800,000 in payments from Neumann through Julius Berman, and that it was "a private engagement between you and Neumann. It was months later that I learned that you had collected money from Neumann and kept it for yourself. Only then did you credit this money to our joint account." The letter also accused Paul Reichmann of saying one thing in the rabbinical proceeding, namely, that he did not release Neumann's debt, and saying another thing in this litigation, namely, that he had released Neumann's debt in 1991. "If you had acted honestly in the din tora, you would have given the besdin any such document you signed at that time." Albert Reichmann closed with, "In line with your 'generosity' of lending the family's money to Neumann whenever he needs it..., you should now lend him $8 million this time from your own pocket so he can repay what he legitimately owes me.... This will avoid the necessity of Neumann to appear in court and avoid going back to the besdin for final judgment on the Neumann matter."

follows: "For deposit only to the account of O&Y 25 Realty Company, L.P."

On September 20, 2006, Neumann's counsel wrote again to Albert Reichmann demanding that the suit be withdrawn, stating that "[t]he guaranteed endorsement on the check removes any doubt, if ever there was doubt, that Paul Reichmann settled and released the claim that his brother now purports to assert against Joseph Neumann."

A week later, Paul Reichmann was deposed under court order through the issuance of letters rogatory. At his deposition, he was asked whether he had signed the 1991 Settlement Agreement with Neumann:

> "Q. ... My question, Mr. Reichmann, is do you recognize your signature on the second page of that document?
> A. Yes, I do.
> Q. And did you sign that document?
> A. Yes, I did."

(September 28, 2006 Deposition of Paul Reichmann at 5.) Paul Reichmann walked out of the deposition in the middle of cross-examination, which was not completed.

In the face of overwhelming evidence that Paul Reichmann's signature on the 1991 Settlement Agreement was authentic, Albert Reichmann and his attorneys still refused to withdraw the suit. Instead, they continued to press breach of contract claims on an even weaker set of allegations, which were changed again as the

parties prepared for trial. Still crucial to the case, however, was the allegation that, in 1996, O&Y 25 Realty Company LP assigned to Albert Reichmann his share of the claim against Neumann.

## F.  The 1996 assignment of the claim against Neumann

Albert Reichmann's theory of the case, as articulated at the January 16, 2007 pretrial conference and in the December 22, 2006 Joint Pretrial Order, was as follows.

Albert Reichmann's position remained that "[t]he signature appearing on the attachment to the March 24, 1992 Julius Berman letter ... above the printed name 'Paul Reichmann' is not the signature of Paul Reichmann." (Joint Pretrial Order at 12.) In addition, he argued that, even if Paul Reichmann's signature was valid, the 1991 Settlement Agreement was null and void as to Paul Reichmann. The reason offered was that the 1991 Settlement Agreement required, by its terms, execution and delivery by March 20, 1992, and Julius Berman did not send Paul Reichmann's signature until March 24, 1992. Either way, according to Albert Reichmann, the debt had not been settled in 1991.

In an attempt to ensure that he would have standing to sue Neumann for breach of contract, Albert Reichmann next alleged that in the summer of 1996, O&Y 25 Realty Company LP assigned its claim against Neumann to the three Reichmann brothers in

equal parts. (Joint Pretrial Order at 13.) Then, in late 1996, according to Albert Reichmann, he and Neumann entered a new contract under which Neumann would repay, in installments, the $27,218,419.31 owed to the three Reichmann brothers. (Id. at 15.) As consideration, Albert Reichmann would forbear enforcement of the debt (id.) by not "pursuing his claim and ... initiating suit" (January 26, 2007 letter of David G. Trachtenberg to the court). Neumann would therefore be able to "work it off slowly." (Joint Pretrial Order at 13.) In exchange for payment of the debt, Neumann would also receive, according to Albert Reichmann, additional "substantial benefits." (Id. at 15.) One such benefit, mentioned by counsel at the pretrial conference, was that Albert Reichmann would not tell Neumann's other creditors that certain proposed signatories of the 1991 Settlement Agreement ultimately received more favorable treatment from Neumann than they would have received had they signed the agreement. (Id. at 12-13; see also January 26, 2007 letter of David G. Trachtenberg to the court, at 2 n.1 ("defendant Neumann also obtained multiple other benefits ... including the avoidance of unwanted publicity respecting certain of the details of Neumann's 1991 composition agreement with his unsecured creditors and possible resulting challenges to that composition agreement").)

At the pretrial conference, I questioned whether Albert Reichmann's newly alleged 1996 contract with Neumann (his fourth attempt to find a contract that had been breached) was supported by adequate consideration. Albert Reichmann's claim for breach of contract had become more and more attenuated as he attempted to explain his way around the documents and facts that continued to arise. At this point, the allegations regarding the existence of a 1996 contract with Neumann appeared to be bordering on the spurious. A late production of documents would shortly show how spurious all of Albert Reichmann's claims had been.

In their joint pretrial order, the parties agreed that Neumann had made several payments to the Reichmanns after the 1991 Settlement Agreement, but disagreed as to what those payments signified. From 1992 to 1995, Neumann made payments "totaling $800,000 to Julius Berman, Esq. on behalf of Paul Reichmann." (Id. at 7.) From 1996 to 2000, Neumann made payments "totaling $3,200,000 to Egosah Reichmann on behalf of Albert Reichmann." (Id. at 8.) Albert Reichmann contended that the installment payments from 1996 to 2000 were part of the 1996 contract that Neumann had breached. (Id. at 13, 15.) Neumann contended in his Proposed Findings of Fact that all of the payments, from 1992 to 2000, were a return favor to Paul Reichmann. "[W]hen Paul Reichmann began experiencing his own

financial problems, Joseph Neumann told Paul Reichmann he was doing better financially and asked Paul Reichmann how he could be of some assistance." (Id. at 19.) Neumann's proposed finding of fact squares with Paul Reichmann's statement that Neumann "fe[lt] a moral obligation to do something for us" despite the fact that Neumann had "no obligation to make any payments." (July 11, 2006 email from Peter Ruby to Paul Bates and Francis C. Healy, enclosing statement by Paul Reichmann.)

Such were the opposing positions in January of 2007 as the parties prepared for trial in March. At the pretrial conference, I directed the parties to resume the deposition of Paul Reichmann in order to complete cross-examination. On January 17, 2007, Neumann's attorney wrote to Paul Reichmann's attorney regarding the continuation of the deposition. On January 19, Paul Reichmann's attorney responded that, although he felt further deposition of Paul Reichmann would not be fruitful:

> "The nature of the questions put by Mr. Trachtenberg at the end of the deposition all relate to the authority of one or all of the Reichmann brothers to make decisions on behalf of entities owned at the time by the Reichmann family and affiliated with Olympia & York.... In an effort to be helpful to the parties, therefore, [Paul] Reichmann asked me to apprise you of the salient facts known to me relating to O&Y 25 Realty Company ... and O&Y 25 Realty, L.P. If these facts are relevant to the matters in dispute, I can arrange to have copies of the relevant documentation copied for you from [my firm's] files."

(January 19, 2007 Letter of John M. Ulmer to Curtis C. Mechling and David Trachtenberg.) The letter explained that on March 12, 1993, O&Y 25 Realty Company and O&Y 25 Realty Company LP "each charged all of their assets in favour of Olympia & York Developments Limited," which had become insolvent. (Id.) The assets of the family partnership secured a $125 million loan to Olympia & York Developments. "Accordingly, after that date the family corporations who were partners in [O&Y 25 Realty Company] ceased to have any involvement whatsoever in the affairs of [O&Y 25 Realty Company and O&Y 25 Realty Company LP] and all decisions were made thereafter by" PricewaterhouseCoopers, the administrator for Olympia & York Developments. Id.

Albert Reichmann's most recent round of allegations was now completely foreclosed. Even if Paul Reichmann's signature on the 1991 Settlement Agreement had been forged (a position that appeared to be spurious given Paul Reichmann's deposition and the additional documentation, such as the endorsed check), and even if the 1991 Settlement Agreement was null and void (a position that appeared to have been waived by the acts of the parties involved), Albert Reichmann's theory still required O&Y 25 Realty Company LP to have the authority, in mid-1996, to assign to Albert Reichmann the partnership's claim against Neumann. The documents promised in the January 19, 2007 letter

from Mr. Ulmer would show that a 1996 assignment would not have been possible.

The documentation provided to the parties by Paul Reichmann's attorney did make clear that the family partnership could not have assigned the claim against Neumann to Albert Reichmann. In particular, the March 12, 1993 Memorandum of Agreement between O&Y 25 Realty Company LP and Olympia & York Developments Limited (the "March 1993 Memorandum") proved that in 1996 the partnership did not have the right to assign any claims. The March 1993 Memorandum stated that O&Y 25 Realty Company LP authorized Olympia & York Developments "to make all decisions and take all actions on behalf of" O&Y 25 Realty Company LP. (March 1993 Memorandum at 2.) Furthermore, Albert, Paul, and Ralph Reichmann agreed that they "shall not incur obligations, make decisions, take actions or execute documents on behalf of [O&Y 25 Realty Company LP] without ... the prior written consent" of Olympia & York Developments. (Id. at 3.) It is important to note that the March 1993 Memorandum was signed by Albert Reichmann. (Id. at 10 (on the line for "A.R.F. Corp.").)

Paul Reichmann's attorney also produced two letters from Philip Siller, one of Albert Reichmann's Canadian attorneys. Mr. Siller wrote to Paul Reichmann's attorney asking for documents regarding Neumann's debt. (May 12, 2005 Letter from

Philip Siller to David A. Ward.) Siller's request enclosed a February 12, 1996 memorandum from John M. Ulmer to Albert Reichmann stating that after the bankruptcy, O&Y 25 Realty Company was indebted to Olympia & York Developments for $129,671,747.78 (Cdn.) and that the note was secured by a pledge of all of O&Y 25 Realty Company's assets. The February 12, 1996 memorandum is evidence that Albert Reichmann was aware, or by 2005 was reminded, of the fact that in 1993 the Reichmann brothers ceased to have any involvement whatsoever in the affairs of O&Y 25 Realty Company LP.

In August, Mr. Siller wrote again to Paul Reichmann's attorney, seeking the corporate records of O&Y 25 Realty Company. However, Mr. Siller stated that Albert Reichmann "does not need materials concerning [O&Y 25 Realty Company's] filings in connection with the Companies Creditors Arrangement Act (Ontario) or the U.S. Bankruptcy Code." (August 22, 2005 Letter from Philip Siller to David A. Ward.) If either Albert Reichmann or his attorneys had asked Mr. Siller for documents regarding the bankruptcy, the March 1993 Memorandum would have been produced in 2005 rather than in 2007 on the eve of trial, and the action would have been dismissed two years earlier.

## G. **The March 2, 2007 motion for sanctions**

On February 2, 2007, Mr. Trachtenberg advised this court that Albert Reichmann would seek voluntary dismissal of his action pursuant to Fed. R. Civ. P. 41. On February 15, Neumann's counsel submitted a memorandum of law urging that any dismissal should be without prejudice to Neumann's motion for sanctions. On that same day, Albert Reichmann moved to voluntarily dismiss his action with prejudice. On February 20, Neumann moved for Rule 11 sanctions; the motion was withdrawn when Mr. Trachtenberg alerted counsel to authority supporting the proposition that Rule 11 sanctions may not be imposed where a Rule 11 motion is not first served 21 days earlier on the party to be sanctioned.

On March 2, 2007, Neumann filed a new motion for sanctions, pursuant to three sources of sanctioning power: (1) Rule 11, based on the Rule 11 motion of May 27, 2005; (2) 28 U.S.C. § 1927; and (3) the court's inherent power to sanction.

A hearing was held on Neumann's motion for sanctions and Albert Reichmann's motion to voluntarily dismiss with prejudice. Albert Reichmann's Rule 41 motion to dismiss was granted, but jurisdiction over Neumann's motion for sanctions was retained.

## DISCUSSION

### I. Sanctions pursuant to 28 U.S.C. § 1927 and inherent powers

A court may sanction attorneys under Title 28 when

excessive litigation costs are caused by unreasonable, vexatious

proceedings:

> "Any attorney or other person admitted to conduct
> cases in any court of the United States or any
> Territory thereof who so multiplies the proceedings in
> any case unreasonably and vexatiously may be required
> by the court to satisfy personally the excess costs,
> expenses, and attorneys' fees reasonably incurred
> because of such conduct."

28 U.S.C. § 1927.

In addition, a court may sanction an attorney or a party

pursuant to its inherent power to manage its own affairs.

Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991). This power

includes the ability "to fashion an appropriate sanction for

conduct which abuses the judicial process," id. at 44-45, such

as the assessment of attorneys' fees against "a party [that] has

acted in bad faith, vexatiously, wantonly, or for oppressive

reasons," id. at 46 (internal quotation marks omitted).

Although "inherent powers must be exercised with restraint and

discretion," id. at 44, the assessment of attorneys' fees as

punishment for bad-faith or wanton conduct serves a "dual

purpose": it "vindicates judicial authority without resort to

the more drastic sanctions available for contempt of court and

makes the prevailing party whole for expenses caused by his

opponent's obstinacy," Hutto v. Finney, 437 U.S. 678, 689 n.14 (1978).

Under Second Circuit case law, to impose sanctions pursuant to either § 1927 or the court's inherent powers "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith -- that is, motivated by improper purposes such as harassment or delay." Eisemann v. Greene, 204 F.3d 393, 396 (2d Cir. 2000) (internal quotation marks omitted). "[T]he only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is ... that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986). But see U.S. v. Seltzer, 227 F.3d 36, 41 (2d Cir. 2000) (no finding of bad faith is necessary when court sanctions attorney for conduct not inherent to client representation).

Albert Reichmann's suit against Joseph Neumann was in bad faith and entirely without color from the start. Albert Reichmann's "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court." Chambers, 501 U.S. at 51. His lawsuit was dishonest

from beginning to end.  He withdrew from his fourth attempt to
articulate a viable cause of action only when documents turned
up that absolutely foreclosed his constantly changing
allegations.  Although these dispositive documents were produced
by a third party, the most important bore Albert Reichmann's own
signature.

Albert Reichmann's attorneys should have investigated their
client's vague claims more thoroughly from the start.  And after
receiving Neumann's January 10, 2005 letter, the enclosed 1991
Settlement Agreement, and the supporting documentation in the
form of correspondence between attorneys for Neumann and Paul
Reichmann, Albert Reichmann's attorneys were obliged to make an
additional investigation into the facts underlying the client's
claims before filing the First Amended Complaint.  They were
obliged to investigate whether Albert Reichmann's claims were
being brought for an improper purpose.  They were obliged to
investigate whether there was any factual support at all for the
claims, beyond the representations of the client.  They failed
to make these investigations and turned a blind eye to the
inconvenient facts and documents presented by Neumann and
others.

## A. Entirely without color

Albert Reichmann's claims for breach of contract and unjust enrichment lacked a colorable basis. "A claim is colorable when it reasonably might be successful, while a claim lacks a colorable basis when it is utterly devoid of a legal or factual basis." Schlaifer Nance & Co., Inc. v. Estate of Warhol, 194 F.3d 323, 337 (2d Cir. 1999). A colorable claim "has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." Id. (internal quotation marks omitted). The question is whether a reasonable attorney or reasonable plaintiff "could have concluded that facts supporting the claim might be established, not whether such facts actually had been established." Id. (emphasis in original; internal quotation marks omitted).

No reasonable attorney or plaintiff would have brought or maintained this claim. The claim against Neumann had been settled by Paul Reichmann on behalf of O&Y 25 Realty Company LP, as proven by the 1991 Settlement Agreement, the endorsed check, and Paul Reichmann's deposition testimony. Albert Reichmann, one of three partners in O&Y 25 Realty Company LP, knew or should have known that this was the case. He certainly must have known that the loan had been guaranteed by O&Y 25 Realty Company LP and not by him individually, since he signed two documents on behalf of the partnership guaranteeing the loan.

Even if he did not know in 1991 that his brother had settled the debt with Neumann, before bringing suit he should have taken the reasonable steps necessary to determine the status of the debt with regard to the partnership. Had he done so, he would have learned that his claim was without factual and legal basis. Having failed to make any reasonable investigation before bringing suit, neither he nor his attorneys can maintain that at the time of filing they had a reasonable belief that facts supporting the claim might be established. It was bad faith to bring this suit without having first made a minimal investigation, and it was bad faith to continue this suit once they had seen the 1991 Settlement Agreement and supporting documents provided by Neumann in his January 10, 2005 letter.

Albert Reichmann's fallback position was spurious and not colorable. At the final pretrial conference and in the Joint Pretrial Order, Albert Reichmann argued that even if the 1991 Settlement Agreement had been signed by Paul Reichmann (a fact virtually beyond doubt but never conceded by Albert Reichmann or his attorneys), he still had a claim against Neumann. In support of this position, he argued that (1) the 1991 Settlement Agreement was null and void (an argument that almost certainly had been waived when Neumann's settlement check was deposited into the O&Y 25 Realty Company LP's bank account); (2) Albert Reichmann had been assigned the partnership's right to pursue

this claim in mid-1996; and (3) Neumann formed a new contract with Albert Reichmann in late 1996, in which Albert Reichmann promised not to sue Neumann and not to give Neumann a bad reputation by spreading gossip about his prior relations with creditors, in exchange for Neumann's promise to pay more than $27 million in installments.

While the third point strains credulity, it is the second point that has been shown to be false and is the reason Albert Reichmann was finally forced to withdraw his spurious suit against Neumann. Neumann now knows what Albert Reichmann has always known: that it was impossible for O&Y 25 Realty Company LP to have assigned its claim in 1996 in the manner described by Albert Reichmann in his deposition, Second Amended Complaint, and Joint Pretrial Order. This fact was established in documents produced by one of Paul Reichmann's attorneys in response to a request by Neumann's attorney. In particular, the March 1993 Memorandum, signed by Albert Reichmann, provided that the brothers "shall not incur obligations, make decisions, take actions or execute documents on behalf of [O&Y 25 Realty Company LP] without ... the prior written consent" of Olympia & York Developments. (March 1993 Memorandum at 3.)

For the foregoing reasons, Albert Reichmann's claims lacked a colorable basis.

## B. Bad faith

A suit is brought in bad faith if it is "motivated by improper purposes such as harassment or delay." Schlaifer Nance, 194 F.3d at 336. Rarely will an offending party announce his bad faith. However, "[b]ad faith can be inferred when the actions taken are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." Id. at 338 (internal quotation marks omitted).

Both Albert Reichmann and his attorneys acted in bad faith. Albert Reichmann's conduct in this case degraded and abused the judicial process. Albert Reichmann's lawyers, by failing to investigate any of the obvious and accumulating clues to the truth, violated their duty as officers of the court. By stubbornly attempting to suppress the truth as long as possible, Albert Reichmann and his lawyers imposed on Neumann costly proceedings, which they unconscionably multiplied.

The bad faith of Albert Reichmann and his attorneys is shown by their stubborn refusal to acknowledge the authenticity of the 1991 Settlement Agreement, by Albert Reichmann's constantly changing story and his attorneys' acceptance of these changes, and by the crucial limitation that Albert Reichmann placed on the document request sent to Paul Reichmann.

## 1.  Denying the authenticity of the settlement

Albert Reichmann's bad faith is demonstrated in part by his insistence that Paul Reichmann's signature on the 1991 Settlement Agreement is a forgery.  Despite Albert Reichmann's familiarity with his brother's signature; despite the documentation supporting the 1991 Settlement Agreement in the form of attorney correspondence regarding the settlement; despite Paul Reichmann's deposition testimony that he signed the agreement; and despite the check from Neumann's escrow account, written for an amount that squared with the amount mentioned in the 1991 Settlement Agreement (plus interest) and the supporting documentation, endorsed by Paul Reichmann, and deposited into the account of O&Y 25 Realty Company LP; despite all of these things, Albert Reichmann still attempts to justify his frivolous action on the ground that Paul Reichmann's signature is a forgery.  (Albert Reichmann's April 30, 2007 Memorandum of Law in Opposition to Defendant's Motion to Impose Sanctions ("Opposition") at 7 ("Paul Reichmann allegedly signed" the 1991 Settlement Agreement, while "[p]laintiff, in turn, disputed, and disputes to this day, that Neumann's debt to his family had ever been released").)

Albert Reichmann offers the following explanation.  First, he contends that he has no memory of the 1991 Settlement

Agreement. At the time he filed the complaint, Albert Reichmann "recalled clearly" that Neumann had been making payments to the Reichmanns through at least June of 2000, that those payments were related to a loan the Reichmanns were involved with, and that Neumann had stopped making payments. He argues that Neumann's payments to the Reichmann family through 2000 were inconsistent with a 1991 settlement. (Opposition at 5-9.)

Second, Albert Reichmann contends that, in the rabbinical proceeding between the brothers, Paul Reichmann's attorney expressly told the panel that Paul Reichmann had not given Neumann a release. Neumann submitted a memorandum in that proceeding, on June 12, 2001, explaining that he had reached an agreement with Albert Reichmann "to settle the remaining outstanding debt to the Reichmann Family for $3,000,000," not inclusive of the $1.4 million already paid through April 1997, and that of this $3 million, all but $400,000 had been paid. Albert Reichmann offers these facts as evidence that the signature of Paul Reichmann on the 1991 Settlement Agreement was not Paul Reichmann's signature. (Opposition at 9-11.)

Neither the statement of Paul Reichmann's attorney in the rabbinical proceeding nor Neumann's June 12, 2001 memorandum provides a good faith basis for this action. The Neumann memorandum stated that Neumann's debt to the Reichmann family would be settled for $3 million. Neumann did pay $3 million to

the Reichmann family: $2.6 million as of the writing of the
2001 memorandum, and $400,000 shortly thereafter. (Joint
Pretrial Order at 9 (stating that, from August of 2001 to July
of 2002, at the direction of Paul Reichmann, Neumann paid
$400,000 to Louis Reichmann).) According to Neumann's 2001
memorandum and the Joint Pretrial Order, therefore, Neumann's
debt was settled in July of 2002. Albert Reichmann denies that
he agreed to settle Neumann's debt for $3 million. (Joint
Pretrial Order at 14.) He therefore relies on Neumann's
memorandum as proof that the debt was not released in 1991, but
refuses to rely on Neumann's memorandum as proof that the debt
was released in 2002.[6]

The events of the rabbinical proceeding do not provide
Albert Reichmann or his attorneys with an excuse for not
investigating the 1991 Settlement Agreement and the other
documents at issue in this case. Their failure to conduct a
reasonable investigation shows their bad faith. They were not
interested in discovering the truth about Paul Reichmann's
signature and his release of Neumann's debt. They were
interested in prolonging the proceedings. At least as early as

---

[6]    Albert Reichmann, in his September 7, 2006 letter to Paul
       Reichmann, states that in the rabbinical proceeding Paul
       Reichmann "gave the besdin a memo from Neumann falsely
       stating that I forgave Neumann's loan, which was totally
       untrue.... In fact, you yourself arranged for our nephew
       Yossi to get this false memo from Neumann and give it to
       the besdin."

January 10, 2005, when Albert Reichmann received Neumann's letter explaining why the claim had no merit, he should have stopped relying on his memory and the rabbinical proceeding, and started an investigation into the 1991 Settlement Agreement and related documents that Neumann had provided. The fact that certain things happened in the rabbinical proceeding does not mean that Albert Reichmann and his attorneys are absolved from investigating relevant documents in the action that they instituted against Neumann.

Albert Reichmann explained that "[u]pon being presented with a copy of the 1991 Settlement Agreement received from defendant's counsel in this action, plaintiff insisted that the signature on the document was not that of his brother Paul Reichmann." (Opposition at 11.) Albert Reichmann and his attorneys hired a handwriting expert, who concluded that "the questioned signature ... is not the genuine signature of Paul Reichmann, based on the submitted known genuine specimen signatures." (September 7, 2006 Report of Findings by John Paul Osborn, Forensic Document Examiner at 2.) Their sole recourse to a handwriting expert does not constitute a good faith inquiry in this case. Albert Reichmann and Paul Reichmann are brothers who live in the same city. (Second Amended Complaint ¶ 1 (Albert Reichmann lives in Toronto); September 28, 2006 Deposition of Paul Reichmann at 3 (Paul Reichmann lives in

Toronto).) It appears from various statements made during the

course of this litigation that the brothers were or still are at

odds. See supra note 4. This does not excuse Albert Reichmann

or his attorneys from taking the most obvious step necessary to

determine the authenticity of Paul Reichmann's signature:

contacting Paul Reichmann and asking if he signed the document.

Even if Albert Reichmann were unwilling to talk to Paul

Reichmann directly, there is no excuse for Albert Reichmann's

attorneys to decline to contact Paul Reichmann's attorneys

regarding the document. Nor is it sufficient for Albert

Reichmann and his attorneys to wait for documents to be produced

from Paul Reichmann based on their prior document requests or to

wait for Neumann to depose Paul Reichmann. When Neumann brought

the 1991 Settlement Agreement to their attention, a document

that appeared to be dispositive, Albert Reichmann and his

attorneys had an obligation to investigate that document to the

extent that there was any doubt as to its authenticity. Hiring

a handwriting expert is not sufficient. They did not proceed

with the obvious step of contacting Paul Reichmann because they

wanted to prolong the litigation.[7]

---

[7]     Albert Reichmann and his attorneys, in their memorandum of
        law in opposition to Neumann's motion for sanctions, argue
        that "although defendant had ample time to locate and
        consult a handwriting expert of his own, defendant did not
        present any testimony from any handwriting expert to rebut
        the conclusions of plaintiff's expert." (Opposition at

As one of Albert Reichmann's attorneys, Mr. Trachtenberg needed to ask himself if it was plausible that someone would forge Paul Reichmann's signature. Given his client's changing rendition of the facts, he needed to make an effort to examine the plausibility of his client's latest story. First he was told that Albert Reichmann and his brothers made the loan to Neumann. (Complaint ¶ 5.) Then, after receiving the January 10, 2005 letter from Neumann, he was told that a bank made the loan, that Paul Reichmann guaranteed it, and that that guarantee was guaranteed by the family partnership. He was also told that Paul Reichmann's signature on the 1991 Settlement Agreement could not possibly be authentic, despite the newly mentioned fact that Paul Reichmann was initially responsible for arranging and guaranteeing the loan. A lawyer cannot be a rubber stamp for a client's changing and inconsistent version of the facts, especially when subsequent versions sound implausible. Rather than retaining a handwriting expert in the hope of generating an expert opinion favorable to Albert Reichmann's case, Mr. Trachtenberg and his firm had a responsibility to contact Paul Reichmann's attorneys in order to try to authenticate the signature. Albert Reichmann's attorneys consistently stood by

---

12.) This is another example of Albert Reichmann's efforts to ignore the facts. Instead of a handwriting expert, Neumann relied on Paul Reichmann's statement under oath that the signature on the agreement was his signature.

the events that Albert Reichmann "recalled clearly," even as his recollection changed and changed again. To insist that Paul Reichmann's signature on the 1991 Settlement Agreement was not authentic, while refusing to take good faith steps to determine its authenticity, amounts to a kind of willful blindness. It was vexatious and harassing to maintain the lawsuit against Neumann, for more than two years, based on Albert Reichmann's constantly changing story and a stubborn refusal to make a reasonable investigation into the authenticity of the signature on the 1991 Settlement Agreement.

## 2. **Albert Reichmann's constantly changing story**

Albert Reichmann fundamentally changed his version of events several times. With each change, his attorneys shifted legal theories in order to accommodate the swings in plaintiff's version of events.

Albert Reichmann, through his April 30, 2007 Memorandum of Law in Opposition to Defendant's Motion to Impose Sanctions, offered this explanation:

> "At the time [of the initiation of this action], plaintiff recalled clearly that during the late 1980s his brother Paul Reichmann had committed the Reichmann Brothers to make or arrange a $25 million loan to or for Neumann. In addition, plaintiff recalled clearly that the loan had not been fully repaid. However, plaintiff did not recall precisely how the loan transaction had been structured. Nor were transaction documents readily and quickly available."

(Opposition at 5.) Therefore, Albert Reichmann alleged in the
original complaint that the loan had been made by or on behalf
of the three brothers.

> "As plaintiff considered documents gathered for
> production in discovery, plaintiff's recollection of
> the structure of this late 1980s transaction was
> refreshed."

(Id.) As a result, the First and Second Amended Complaints
alleged that O&Y 25 Realty Company LP had paid Neumann's
outstanding balance to the bank.

> "In addition, the Second Amended complaint explained
> that Plaintiff's standing to sue in his individual
> capacity to recover his one-third share of this debt
> was premised on assignment. As noted above, Neumann's
> debt was originally owed by subrogation to the
> Reichmann Brothers' family partnership, [O&Y 25 Realty
> Company LP]. Plaintiff believed and alleged that [the
> family partnership] assigned a one third share of the
> family partnership's claim against Neumann to each of
> the Reichmann brothers during the summer of 1996.
> Plaintiff further believed and alleged that this
> assignment was effected in two ways: first, by
> plaintiff exercising his right to act unilaterally on
> behalf of [O&Y 25 Realty Company LP]'s general
> partner, O&Y 25 Realty Company ..., and second, by
> plaintiff and Paul Reichmann, acting jointly on behalf
> of [O&Y 25 Realty Company]."

(Id. at 6.) Even if all of this were true, none of it explains
or excuses Albert Reichmann's bad faith conduct throughout this
litigation.

After the dismissal of the original complaint, the First
Amended Complaint corrected Albert Reichmann's erroneous
assertion that he had personally made the loan to Neumann. That

complaint was dismissed for failure to identify the ground on which Albert Reichmann had standing to sue Neumann on behalf of the partnership. The Second Amended Complaint alleged a third version of events: that Albert Reichmann had assigned the claim against Neumann to himself, "acting for" the partnership as a whole, since "each [brother] had the right, power and authority to act without consulting the others in matters of this kind." (Second Amended Complaint ¶ 23.) Albert Reichmann now stated that he "cause[d] the entire claim against Neumann to be assigned in equal parts to Albert Reichmann, Paul Reichmann and Ralph Reichmann." (Id.)

When Albert Reichmann realized that the endorsed check and the deposition of Paul Reichmann made the third version of events questionable, he provided a fourth version in preparation for trial. Under this fourth version of the facts, the 1991 Settlement Agreement was either forged or null and void.[8] Albert

---

[8]  In order for the 1991 Settlement Agreement to be inauthentic, Albert Reichmann and his attorneys had to believe (1) that the signature had been forged by someone else; (2) that the attorney correspondence regarding the settlement had been forged; (3) that Paul Reichmann was lying or mistaken when he said (a) that it was his signature and (b) that he had settled the debt with Neumann such that Neumann had "no obligation to make any payments"; and (4) that the check for $217,211.69, drawn from an IOLA account at Stroock & Stroock & Lavan (Neumann's attorneys) and deposited into the account of O&Y 25 Realty Company LP, had been written for some reason other than in settlement of Neumann's debt, notwithstanding the fact that the amount of the check was the same amount mentioned in the April 2,

Reichmann now maintained that the claim had been assigned to him
in mid-1996. He alleged that he and Neumann entered a new
contract in late 1996. Under this contract, Albert Reichmann
would refrain from tarnishing Neumann's reputation and suing
Neumann for the loan. In exchange, Neumann would pay the entire
outstanding amount of the loan in installments. Although Albert
Reichmann had stated in the Second Amended Complaint that he
assigned the claim "in equal parts to Albert Reichmann, Paul
Reichmann and Ralph Reichmann" (Second Amended Complaint ¶ 23),
he now said that he had entered into a contract with Neumann for
the entire claim, "acting on behalf of himself and Paul
Reichmann and Ralph Reichmann." (Joint Pretrial Order at 15.)

Albert Reichmann's lawyers, once again, accepted this
entirely new version of the facts without any apparent attempt
at a reasonable investigation. In September of 2006, Neumann
again wrote to demand withdrawal of the suit. Albert Reichmann
and his attorneys responded by insisting on a trial.

Mr. Trachtenberg presented Albert Reichmann's most recent
argument through the Joint Pretrial Order and his January 26,
2007 letter to the court. Although his letter cited cases
holding that "forbearance from asserting a claim or enforcing

1992 letter from Barbara Kaplan to Julius Berman. (Albert
Reichmann admits that Paul Reichmann endorsed the check and
deposited it in the partnership's account (Joint Pretrial
Order at 7.).)

legal rights which a party in good faith believes he has
constitutes a detriment and thus consideration" (January 26,
2007 letter of David G. Trachtenberg to the court), he
apparently never stopped to ask himself if Albert Reichmann's
fourth version of the facts was at all plausible. A lawyer has
a responsibility to examine the plausibility and supportability
of the client's claims. Our legal system depends on lawyers, as
officers of the court, to conduct reasonable inquiries before
asserting claims. The need for further inquiry must have become
apparent to Mr. Trachtenberg and his firm as their client's
story continued to change, in ways that were inconsistent, to
accommodate the new facts and documents being produced. That
they failed here to make such inquiry, thereby multiplying the
proceedings unreasonably and vexatiously, demonstrates bad
faith.

     As they prepared for trial, Albert Reichmann and his
attorneys had to prove their case in three steps: (1) Paul
Reichmann's signature on the 1991 Settlement Agreement was a
forgery; (2) O&Y 25 Realty Company LP had the right, in 1996, to
assign its claim to Albert Reichmann, and did so; and (3) Albert
Reichmann and Neumann entered a contract in 1996 that Neumann
had subsequently breached. The first and third steps appeared
to be nearly impossible to prove, but the inability to prove the
second step is what finally led to the withdrawal of the case.

As discussed above, the 1993 Memorandum, a document signed by
Albert Reichmann but produced by Paul Reichmann's attorney,
proved that O&Y 25 Realty Company LP could not have assigned its
claim in 1996. With the production of that document, and other
documents produced with it, Albert Reichmann's spurious claims
could no longer be pursued.

### 3. Bad faith limitation of document requests

Among the documents produced by Paul Reichmann's attorney
were two letters by Philip Siller, who was one of Albert
Reichmann's Canadian attorneys. The second of Mr. Siller's
letters, written in August of 2005, contains a document request
that was suspiciously limited.

Mr. Siller asked for the corporate records of O&Y 25 Realty
Company, but explicitly stated that Albert Reichmann "does not
need materials concerning [O&Y 25 Realty Company's] filings" in
connection with the bankruptcy. The bankruptcy documents, of
course, included the 1993 Memorandum in which the Reichmann
brothers agreed that no actions or decisions would be made
regarding O&Y 25 Realty Company LP without the prior written
consent of Olympia & York Developments.

This limited document request also demonstrates bad faith.
Had the request not carved out the bankruptcy materials, the
March 1993 Memorandum and related documents would have been

produced much earlier and the proceedings would not have been unreasonably prolonged through 2007.

For the foregoing reasons, I find that Albert Reichmann acted in bad faith throughout the litigation. In addition, I find that Albert Reichmann's attorneys acted in bad faith from the time they began preparing the First Amended Complaint. In an attempt to prolong the litigation, they refused to make reasonable and appropriate inquiries in light of (1) Neumann's January 10, 2005 letter and the enclosed documents, (2) Neumann's May 27, 2005 letter, and (3) Albert Reichmann's constantly changing and implausible version of events.

## II. Sanctions pursuant to Rule 11

The parties disagree as to whether Neumann's motion for sanctions comes within the safe harbor provision of Rule 11.

Rule 11 requires attorneys to perform an "inquiry reasonable under the circumstances" into the allegations and factual assertions presented in a pleading, and to have concluded that those allegations and assertions "have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). As explained above, Albert Reichmann's attorneys repeatedly failed, throughout the long course of this

litigation, to make inquiries reasonable under the
circumstances.

At issue, therefore, is whether this failure is protected
by the Rule 11 "safe harbor." "The 'safe harbor' provision of
Rule 11 requires that a party moving for sanctions must first
serve the motion on the party to be sanctioned without filing it
with the Court. The party to be sanctioned has twenty-one days
to correct or withdraw the offending papers. If the papers are
not corrected or withdrawn, the party seeking sanctions then
files the motion with the Court." Gamla Enters. N. Am., Inc. v.
Lunor-Brillen Design U. Vertriebs GmbH, No. 98 Civ. 992, 2000 WL
193120 (S.D.N.Y. Feb. 17, 2000).

Neumann argues that his May 27, 2005 motion for sanctions,
served upon Albert Reichmann but not filed with the court, set
the twenty-one day clock in motion. Therefore Albert Reichmann
was not entitled to safe harbor protection from the March 2,
2007 motion for sanctions. Neumann relies on Carousel Foods of
Am., Inc. v. Abrams & Co., Inc., in which a motion for sanctions
was denied without prejudice as premature, then revived sua
sponte by the court as the basis to impose sanctions. 423 F.
Supp. 2d 119, 123-24 (S.D.N.Y. 2006). The plaintiff had filed
an amended complaint after the motion for sanctions had been
filed, but the court found that the amended complaint "did not
change even one of the scurrilous allegations that had prompted

the service of the Rule 11 motion." Id. at 124. The court determined that the safe harbor period had been triggered despite the denial of the motion and the amendment of the complaint. Since more than twenty-one days had passed, sanctions could be imposed.

Albert Reichmann and his attorneys take the position that Neumann's first Rule 11 motion made arguments different from his current motion for sanctions, that their complaint was amended to address the arguments made in the first motion for sanctions, and that therefore the rule of Gamla, not Carousel Foods, should apply. The counterargument is that, as in Carousel Foods, the amended complaints failed to correct the primary deficiency of the claim. All of Albert Reichmann's complaints had the same flaw, which is that case-dispositive "facts could have easily been disclosed with a minimal amount of investigation." (May 27, 2005 Letter of Brian M. Cogan to David G. Trachtenberg.)

The filing of Albert Reichmann's complaint was outrageous. The pursuit and prolongation of the case through constantly changing assertions of fact and theory by both client and lawyer is inexcusable. There is an overwhelming case for sanctions under 28 U.S.C. § 1927 and the inherent power of the court. Accordingly, it is not necessary to parse out the precise reach of Rule 11, the spirit of which was clearly violated.

## CONCLUSION

Faced with dispositive evidence against them, primarily in the form of a document signed by plaintiff himself, a document about which he must have known, Albert Reichmann and his attorneys were finally forced to abandon a spurious claim that they had pursued and pursued and pursued. The claim was dishonest from the beginning, and Albert Reichmann concocted spurious theory after spurious theory in an attempt to stay in court and harass Joseph Neumann. Unfortunately for all involved, his attorneys did not reasonably question him or investigate the support for his claims, even as the facts he alleged grew more and more implausible.

Sanctions against Albert Reichmann, pursuant to the inherent power of this court, are assessed for 100% of Neumann's costs and attorneys' fees. Sanctions against David Trachtenberg and the firm of Trachtenberg Rodes & Friedberg, pursuant to 28 U.S.C. § 1927 and the inherent power of this court, are assessed for 70% of Neumann's costs and attorneys' fees, jointly and severally with Albert Reichmann.

Counsel for Joseph Neumann is directed to submit records of the expenses, costs, and attorneys' fees incurred by Neumann in the defense of this action.

SO ORDERED.

Date:     New York, New York
          April 22, 2008

                                 _____
                                 MIRIAM GOLDMAN CEDARBAUM
                                 United States District Judge